UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
RIF LINE INTERNATIONAL SpA,     :
       :
       Petitioner,     :
       :    24-cv-3248(MMG)
     v.     :
       :
INTEGR8 FUELS PTE LTD.,     :
       :
       Respondent.     :
-------------------------------------------------------X

## MEMORANDUM OF LAW OF
## RESONDENT INTEGR8 FUELS PTE LTD.
## IN RESPONSE TO ORDER TO SHOW CAUSE

Respondent, Integr8 Fuels Pte Ltd. ("Integr8" or "Respondent"), hereby submits this Memorandum of Law in response to the motion for injunctive relief brought on by Petitioner, RIF Line International SpA's Order to Show Cause entered on April 29, 2024 (ECF No. 8).

## PRELIMINARY STATEMENT

Pursuant to the Order to Show Cause, Petitioner, RIF Line seeks a preliminary injunction and permanent injunction restraining Integr8 from continuing with arbitration proceedings (the "Arbitration") commenced before the Society of Maritime Arbitrators of N.Y., Inc. ("SMA"). Integr8 commenced the arbitration proceedings in conjunction with the unpaid and outstanding balance due to Integr8 for fuel it supplied to RIF Line and/or Kalypso Compagnia di Navigazione SpA ("Kalypso") pursuant to multiple agreements providing for arbitration in New York. As set out in detail below, RIF Line's motion for injunctive relief must be denied because, (1) valid agreements to arbitrate exist between RIF Line and Integr8, and (2) even in the absence of a specific agreement, RIF Line is bound to arbitrate against Integr8 pursuant to the exceptions set forth in *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 775 (2d Cir. 1995).

## RELEVANT FACTS

RIF Line is, among other things, a ship owner and operator. In 2022, RIF Line alleges that it began to shift its chartering operations to a new entity, Kalypso. *See* Declaration of Francesco Isola ¶4 (hereinafter "Isola Decl. ____"). RIF Line admits in its motion papers that at all relevant times it was the majority owner of Kalypso. *Id.* RIF Line and Kalypso were commonly managed by Francesco Isola. *Id.* At all times relevant here, Mr. Isola was the President of Kalypso and the Chief Executive Officer ("CEO") of RIF Line. *Id.* Though Mr. Isola attempts to categorize Luca Scagliarini, as an "outside consultant" (*id. ¶ 5*) he was, and still is, an employee of RIF Line and Kalypso. Specifically, Mr. Scagliarini was the fleet manager for both RIF Line and Kalypso. *See* Exhibits G and H attached to the Declaration of Duncan McGregor (hereinafter "McGregor Decl. _____"). Mr. Scagliarini was the managerial employee of both RIF Line and Kalypso responsible for purchasing bunkers (marine fuel oil) from Integr8. At various times, RIF Line offered to guarantee the obligations of Kalypso. *See* McGregor Decl. and ¶¶ 5 (Exs. B and E) 14 and 17. In at least one instance in their dealings with Integr8, RIF Line arranged a payment of over $500,000.00 on outstanding balances due on invoices issued to Kalypso and RIF Line. *See* McGregor Decl. ¶ 16, Ex. C.

Integr8 is a bunker trading company that has supplied RIF Line and Kalypso with fuel for ocean going vessels under their operation and/or ownership. As relevant to RIF Line's motion, Integr8 supplied RIF Line with fuel for four of its ships:

- M/T ZHONG GU PENG LAI – Invoice Nos. IFPL18664 and IFPL19473;
- M/V ZHONG GU YING KOU – Invoice No. IFPL19078;
- M/T ZHONG GU XIONG AN – Invoice Nos. IFPL16852; IFPL17631; and IFPL17757; and
- M/V ZHONG GU LIN YI – Invoice No. IFPL17823.

*See* McGregor Decl. ¶ 5, Ex. A.

The most recent of the above-referenced invoices is dated September 20, 2023. Each of the bunker confirmations identified the buyer as "Kalypso Compagnia di Navigazione SpA and/or RIF Line International SpA." The bunker confirmations were sent the same day the transaction was confirmed, and the bunkers were subsequently supplied to the vessels on the supply date reflected on the Integr8 invoices.

These contractual arrangements between Integr8, Kalypso and RIF Line were in place covering a multitude of transactions since at least October 2022. All of the bunker confirmations constituting the governing contracts sent by Integr8 to RIF Line designated the buyer as "Kalypso Compagnia di Navigazione SpA and/or Rif Line International SpA." *See* McGregor Decl. ¶ 10. Despite having received copies of each Integr8 bunker confirmation and each Integr8 invoice identifying Kalypso and/or RIF Line as buyer, the first time RIF Line objected to this designation was on or around April 8, 2024, when RIF Line's counsel wrote to the SMA arbitrators in response to Integr8's demand for arbitration. Tellingly, on January 5, 2023, Mr. Scagliarini instructed all bunker sellers to send all future invoices, whether to Kalypso or RIF Line to several individuals at RIF Line. *See* McGregor Decl. at ¶¶ 5 (Ex. M) 11.

The bunker confirmations incorporated by reference Integr8's General Terms and Conditions ("Integr8's GTCs"). Clause 1 of the Integr8 GTC's provides the following definition of "Buyer": **"Buyer"** means the company(ies) named in the Confirmation Note buying the Products on their own behalf under a Contract with the Seller . . . ." *See* Isola Decl. Ex. A (ECF No. 5). Clause 14 of the Integr8's GTCs requires that "any dispute arising under, in connection with or incidental to this Contract" shall be arbitrated at New York City, New York before a three-person panel, pursuant to the Rules of the SMA." *Id.* As explained herein, RIF Line, as well as Kalypso, was a buyer of the bunkers sold by Integr8 under the governing bunker confirmations,

and in contractual privity with Integr8 – and therefore is bound by the arbitration clause in the Integr8 GTCs.

The relevant bunker confirmations and invoices at issue were sent to Mr. Scagliarini's RIF Line email. *See* McGregor Decl. ¶ 5, Ex. A. Prior to Kalypso's incorporation, RIF Line routinely ordered bunkers from Integr8. Those bunkers were also ordered by Luca Scagliarini. *See* McGregor Decl. ¶ 6, Ex. H.

Despite his sworn statement to the contrary (*see* Isola Decl. ¶ 10), Mr. Isola had actual, personal knowledge of RIF Line and/or Kalypso both being identified as buyer under the Integr8 confirmations as early as March 29, 2023 when Integr8 sent Mr. Isola, as well as Mr. Scagliarini and other RIF Line employees, copies of outstanding invoices addressed to "Kalypso Compagnia di Navigazione SpA and/or Rif Line International SpA," as buyers. *See* McGregor Decl. ¶ 15, Ex. O. In addition, Mr. Isola, from his RIF Line email, sent Integr8 payment confirmation on Kalypso's behalf in relation to these same invoices naming RIF Line as a buyer together with Kalypso. *See* McGregor Decl. ¶ 16, Ex. C.

In further contradiction of Mr. Isola's sworn statement, on October 30, 2023, Integr8's revenue control department contacted several individuals from RIF Line, including Mr. Scagliarini, at his RIF Line email address, to provide a Statement of Accounts. *See* McGregor Decl. ¶¶ 5 (Exs. Q and R.) and 18. The Statement of Accounts provided on October 30, 2023 contained each of the invoices at issue here. *See* McGregor Decl. at ¶ 5, Ex. Q. Ms. Mirella Baraldi, of RIF Line's accounting department, responded to this email stating "thank you for your SOA, as soon as possible we will give you information about the payment. sorry for the delay." *Id.* Despite Mr. Isola's contentions that RIF Line was not obligated to pay Integr8's invoices, Ms. Baraldi's

email demonstrates that at a minimum, RIF Line's accounting department believed it was obligated to and intended to pay the invoices at issue.

Upon information and belief, RIF Line appears to have purchased the M/V BURGUNDY with the intention of having Kalypso operate the ship under a bareboat charter party from the bank that financed its acquisition, and Kalypso then sub-chartered the Vessel back to RIF Line. *See* McGregor Decl. ¶ 18. Thus, RIF Line appears to have been a beneficiary of all of the bunkers sold by Integr8 at issue in the arbitrations.

## ARGUMENT

### POINT I

### THE STANDARD FOR ISSUANCE OF INJUNCTIVE RELIEF

In its supporting Memorandum of Law (ECF No. 4), RIF Line skims over the standard applicable to the injunctive relief it has sought. In *Integr8 Fuels, Inc. v. Daelim Corp.*, No. 17 CV 2191-LTS, 2017 U.S. Dist. LEXIS 62702 (S.D.N.Y. Apr. 25, 2017), the court wrote:

> "A party seeking a preliminary injunction must either show that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest; or he may show irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (internal citation and quotation marks omitted).

RIF Line does, however, contend that its burden of proof is only to show "a likelihood of success in demonstrating that Integr8 cannot establish it (sic) entitlement to arbitrate. RIF Line Memo of Law at 6 (ECF No. 4)(citing *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n. 2 (2d Cir. 2019). As discussed below, however, RIF Line[1] has failed to establish a probability of success

---

[1] RIF Line is represented by the same counsel that represented Daelim as the party seeking to arbitrate disputes with Integr8.

on the merits even under this standard. It has also failed to show that it would suffer irreparable harm in the absence of injunctive relief, it has failed to show that the balance of equities tips in its favor and it has failed to even discuss the public interest factor. Accordingly, RIF Line's motion for injunctive relief should be denied.

## POINT II

### RIF LINE IS NOT ENTITLED TO INJUNCTIVE RELIEF AND IS BOUND BY AGREEMENT TO ARBITRATE INTEGR8'S CLAIMS

RIF Line's obligation to arbitrate under the arbitration clause in the Integr8's GTCs, as incorporated by reference in each bunker supply contract, arises upon no fewer than three bases. First, RIF Line agreed to arbitrate with Integr8. RIF Line purchased bunkers from Integr8 on numerous occasions. In exchange for the bunkers Integr8 provided, RIF Line received and accepted, without objection, bunker confirmations and invoices from Integr8, which stated that "[Integr8's GTCs] (including the arbitration clause within those [GTCs] . . . ) will apply to this contract . . .. " Second, even in the absence of an explicit agreement to arbitrate, RIF Line is obligated to arbitrate with Integr8 through traditional agency principles. Finally, RIF Line is obligated to arbitrate with Integr8 because Kalypso is RIF Line's alter ego.

### A.   RIF Line is Contractually Obligated to Arbitrate with Integr8

The first, and primary reason why RIF Line is not entitled to injunctive relief enjoining the arbitrations is because it is a party to contracts with Integr8 pursuant to which the parties have agreed to submit disputes to arbitration.

It cannot be reasonably debated that the contracts at issue (and the unpaid balances due) are for the sale of goods, namely bunkers, between merchants. Accordingly, the provisions of Article 2 of the New York Uniform Commercial Code govern the contracts at issue. *See* N.Y. U.C.C. §§ 2-102; 2-104(1); and 2-105(1). Article 2, which provides for the enforcement of buyer's

and sellers' rights in the maelstrom of day-to-day commerce, recognizes that agreements or contracts for the sale of goods, especially among merchants who continually deal with each other, are rarely independently negotiated. Relevant[2] to RIF Line's Petition is N.Y. U.C.C. § 2-201(2) (the "Merchant Exception").   This section of Article 2 balances the need of buyers and sellers to do business efficiently, and provides that in contracts between merchants, boilerplate terms in buyers' or sellers' forms delivered at the time of the transaction generally and effectively bind the other party, except where an objection is made within 10 days. Section 2-201(2) provides as follows:

> between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

N.Y. U.C.C. § 2-201(2). Implicit in this structure is that where a merchant timely objects to terms, it has effectively rescinded the contract until the terms are resolved and the rescinding merchant may undo the sale transaction.  Here, neither Kalypso nor RIF Line made any objection to Integr8's confirmations.

Bunker confirmations or invoices that are retained without objection may fall within the Merchant Exception. [3] *See Bazak Int'l Corp. v. Mast Indus., Inc.*, 73 N.Y.2d 113, 116 (1989). If a document is "'sufficient to indicate that a contract for sale has been made'[, . . . . then the recipient is obliged to] 'make a written objection where there is an intent to disavow it.'"[4] *Premier*

---

[2] Here, the only contract document is the Integr8 bunker confirmation.  Thus, UCC rules relating to conflict of forms, N.Y. U.C.C. section 2-207, do not apply.

[3] Integr8, RIF Line and Kalypso are all parties dealing in the marine bunker trade, and thus fall within the definition of merchants.  *See, e.g., Great Am. Lines v. Global Petroleum Corp.,* Civ. No. 95-3699 (DRD), 1997 U.S. Dist. LEXIS 24472 (D.N.J. Oct. 14, 1997).

[4] Although the *Bazak* court went on to state that the consequence of failing to give timely written objection to a confirmatory writing is only to remove the bar of the Statue of Frauds, and that the burden of proving a contract was made, and its terms, remains with the plaintiff, here Rif Line admits contracts were made, and only contests whether

*Mountings, Inc. v. Clyde Duneier, Inc.*, 2003 U.S. Dist. LEXIS 13527, at *8 (S.D.N.Y. Aug. 6, 2003)(quoting *Bazak*, 73 N.Y.2d at 122).

As noted above, in each of the bunker confirmations at issue here, the buyer was identified as "Kalypso Compagnia di Navigazione SpA and/or RIF Line International SpA." Each of the confirmations were sent to the RIF Line email address of RIF Line's "fleet manager," Mr. Luca Scagliarini.[5] RIF Line's first objection to the bunker confirmations was not within ten days of receiving the confirmations, or even the invoices as required by UCC § 2-201. Rather, it was only after Integr8 commenced arbitration many months after the confirmations were issued.

There is no dispute that RIF Line and Integr8 are merchants, that the bunker confirmations were sent within a reasonable time, that Mr. Scagliarini – acting in his capacity as fleet manager for both RIF Line and Kalypso - is an individual who had reason to know of their contents, that no objection, whether oral or written, was made within ten days, and that the bunker confirmations indicate the existence of an agreement between Integr8 on the one hand and RIF Line and Kalypso on the other. As such, RIF Line is a party to the bunker confirmations and is obligated to arbitrate pursuant to Clause 14 of Integr8's GTCs. *See Den Norske Veritas Oljeselskap A.S. v. Hydrocarbon Processing,* 992 F.Supp. 913 (S.D. Tex. 1998) (confirmations faxed to buyer's broker sufficient confirmation forming contracts under UCC § 2-201, and not mere offers because they did not require further action by either party).

"[B]ecause of the 'strong federal policy favoring arbitration ... doubts as to whether a claim falls within the scope of [an] agreement should be resolved in favor of arbitrability.'" *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 68-69 (2d Cir. 2005) (omission in original) (quoting *ACE*

it was a party to such contracts. *See* RIF Line Memorandum of Law at 5 (ECF No. 4); Isola Declaration ¶¶ 7-9 (ECF No. 5).
[5] As mentioned above, Mr. Scagliarini was the fleet manager for both RIF Line and Kalypso. *See* McGregor Decl. ¶ 5, Exs. G and H.

*Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002)). Here, the bunker confirmations plainly list RIF Line as a buyer, together with Kalypso. RIF Line has raised a belated, disingenuous objection to its role as a party to the subject contracts which, at best, raise a manufactured "doubt" as to whether it is bound to arbitrate Integr8's claims. In accordance with *Denney* and *Ace Capital*, any such "doubt" should be resolved in favor of arbitrability.

It is appropriate to resolve any doubt, or ambiguity, in favor of a finding that RIF Line was a party to the Integr8 bunker confirmation because the course of the parties' dealings shows that RIF Line understood that it was a joint and several buyer with Kalypso under the Integr8 bunker confirmations. In *CT Chems., Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179-80 (1993), the Court explained:

> Where a contract involves repeated occasions for performance and opportunity for objection "any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement" (UCC 2-208 [1]). "[S]uch course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance" (UCC 2-208 [3]). This section recognizes that the "parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was" (UCC 2-208, comment 1).

Presented with numerous opportunities to object to RIF Line being named a buyer under the Integr8 bunker confirmations, in the absence of any such objection, it is appropriate for the Court to conclude that RIF Line was a party to the bunker confirmations and is therefore bound to arbitrate disputes with Integr8. *Id.* See also *Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, 728 F. Supp. 2d 531, 535 (S.D.N.Y. 2010) ("[W]hen considering a sale of goods contract under the U.C.C[.], the determination of a contract's meaning ... is done in conjunction

with evidence about course of dealing,[6] usage of trade, and the parties' course of performance so long as that extrinsic evidence does not contradict the contract's language.")

For the foregoing reasons, RIF Line should be estopped from denying that it is a party to the Integr8 bunker confirmations and that it is bound to arbitrate disputes with Integr8 thereunder.

## B.     If RIF Line is Not a Signatory, it is Nevertheless Bound by the Arbitration Agreement

If this Court determines that RIF Line was not a proper party to the bunker confirmations, RIF Line should nevertheless be obligated to arbitrate through one of the applicable exceptions wherein non-signatories have been bound to arbitrate. "New York law recognizes five theories under which non-signatories may be bound to the arbitration agreements of others: (i) incorporation by reference; (ii) assumption; (iii) agency; (iv) veil-piercing/alter ego; and (v) estoppel." *Teachers Ins. & Annuity Assn. of Am. v Adair*, 2023 US Dist. LEXIS 45601, at *19 (S.D.N.Y. Mar. 17, 2023)(citing *Thomson-CSF, S.A.*, 64 F.3d at 776 and *Kwatinetz v. Mason*, 356 F. Supp. 3d 343, 348 (S.D.N.Y. 2018)).

### 1.     Traditional Agency Principles Bind RIF Line to Arbitrate

Agency involves a relationship where "'the agent acts subject to the principal's direction and control." *J.B. Plumbing & Heating of Va., Inc. v. Yellowstone Capital LLC*, No. 21-cv-6386 (MKV), 2022 U.S. Dist. LEXIS 178060, at *19 (S.D.N.Y. Sep. 29, 2022)(quoting *Shulman Transport Enterprises, Inc. v. Pan American World Airways, Inc.*, 744 F.2d 293, 295 (2d Cir. 1984). "[A] nonsignatory to a [contract] may be bound to that document's arbitration clause if, inter alia, the signatory to the [contract] was acting in an agency capacity for the nonsignatory."

---

[6] N.Y. U.C.C. section 1-303(b) provides: "A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

*Dun Shipping LTD. v. Amerada Hess Shipping Corp.*, 2005 U.S. Dist. LEXIS 23114, at *29-30 (S.D.N.Y. Oct. 5, 2005) (quoting *Continental U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A.*, 658 F. Supp. 809, 813 (S.D.N.Y. 1987). "A principal is disclosed if at the time of a transaction conducted by the agent, the other party thereto has notice that the agent is acting for a principal and of the principal's identity, the principal is disclosed." *Dun Shipping Ltd. v. Amerada Hess Shipping Corp.*, 2005 U.S. Dist. LEXIS 23114, at *31 n.7 (S.D.N.Y. Oct. 5, 2005)(internal marks omitted).

Kalypso was the agent for its disclosed principal, RIF Line. At all times relevant here, RIF Line was well known to Integr8. In fact, in February of 2022, prior to Kalypso becoming operational, Luca Scagliarini, offered on behalf of RIF Line to execute a "patronage guarantee" in favor of Kalypso. *See* McGregor Decl. ¶ 5, Ex. B. Specifically, Mr. Scagliarini stated that RIF Line would remain "joint and several guarantor of Kalypso's obligations." Not coincidentally, as noted above, each of the bunker confirmations identified RIF Line and Kalypso as joint and several obligors. In light of RIF Line's corporate structure as disclosed to Integr8, and RIF Line's representations to Integr8 regarding the RIF Line and Kalypso parent/subsidiary relationship with RIF Line acting as "joint and several guarantor of Kalypso's obligations" (*id*), as well as the prior executed bunker sale transactions between RIF Line, Kalypso and Integr8, it is only reasonable to conclude that Kalypso was acting on RIF Line's behalf. Accordingly, RIF Line is also obligated to arbitrate under traditional agency principles.

## 2. RIF Line Dominated Kalypso

A parent company may "be held liable for the acts of its subsidiary when the subsidiary is merely an alter ego of the parent." *Kiobel v. Royal Dutch Petr. Co.*, 621 F.3d 111, 195 (2d Cir.

2010). As will be explained below, Kalypso is RIF Line's alter ego in that RIF Line dominated Kalypso and RIF Line utilized Kalypso in an attempt to defraud Integr8.

The corporate veil may be pierced "where (1) a corporation uses its alter ego to perpetrate a fraud or (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own." *Status Int'l S.A. v. M & D Maritime Ltd.*, 994 F. Supp. 182, 186 (S.D.N.Y. 1998) (citing *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 342 (2d Cir. 1986)) (emphasis in original). Within the Second Circuit, the courts look to the following factors to examine alter ego liability:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of business discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm['s] length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 509 (S.D.N.Y. 2012). No one factor is dispositive and "[t]here is no set rule as to how many of these factors must be present to warrant piercing the corporate veil." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008) (citation omitted). Rather, "the general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result." *Id.* (citation omitted).

Here, piercing the corporate veil is necessary to achieve an equitable result because RIF Line dominated Kalypso to the point where it orchestrated Kalypso's insolvency. *See* McGregor Decl. ¶ 5, Ex. N.

Kalypso and RIF Line routinely disregarded corporate formalities when their common employees would transact business on behalf of Kalypso through a RIF Line email, or vice versa. As demonstrated by Kalypso's liquidation proceeding, it was inadequately capitalized. Mr. Isola, acting on RIF Line's behalf, arranged for payment of bunkers stemmed to RIF Line and/or Kalypso. *See* McGregor Decl. ¶¶ 16, Ex. C, ¶ 19.

Furthermore, RIF Line and Kalypso shared key personnel, including but not limited to Francesco Isola, the President of Kalypso and the CEO of RIF Line, and Luca Scagliarini, the fleet manager for both RIF Line and Kalypso. Though Kalypso and RIF Line claim not to have shared an office, that is irrelevant in this day and age where remote work has become commonplace.

Upon information and belief, RIF Line and Kalypso did not deal with each other at arms-length in that RIF Line purchased a Vessel for Kalypso's commercial use. Specifically, RIF Line appears to have purchased the M/V BURGUNDY with the intention of having Kalypso operate the ship under a bareboat charter party from the bank that financed its acquisition, and Kalypso then sub-chartered the Vessel back to RIF Line. *See* McGregor Decl. ¶ 20, Ex. J. The purchase and charter party arrangements of the M/V BURGUNDY go to factors 7, 9, and 10 of *Clipper Wonsild*, *supra*. As well, going to the eighth alter ego factor, Kalypso and RIF Line have consolidated their taxes in Italy, which is a commonly used accounting procedure whereby a parent and its subsidiaries are treated as a single entity for tax purposes. *See* *https://taxsummaries.pwc.com/italy/corporate/group-taxation*.

As noted previously, Mr. Scagliarini, acting on RIF Line's behalf offered to guarantee Kalypso's payment to Integr8. *See* McGregor Decl. ¶ 5, Ex. B. Furthermore, on October 18, 2023, Francesco Isola, acting on behalf of RIF Line, indicated to Integr8 that he saw no reason why RIF Line would not guarantee Kalypso's debts. *See* McGregor Decl. ¶ 16.

Considering Kalypso voluntarily entered liquidation within two-years of its incorporation and RIF Line being its biggest creditor, it cannot reasonably be disputed that Kalypso was not a profit center in any sense. This fact is laid bare in Kalypso's Annual Report for fiscal year 2022 in which it states that the company's financial statement as at 31 December 2022 reasonably taking into account the "financial support guaranteed by the parent company," i.e., RIF Line. The report goes on to provide that Kalypso faced a "liquidity risk" but that it believed it had access to "sources of financing" based on the availability of credit lines and with the "help of other companies in the Rif Line Group and the parent company Rif Line International SpA." *See* McGregor Decl. ¶ 14, Ex. E.

Ultimately, RIF Line exercised complete domination and control over Kalypso on a day-to-day basis, warranting disregard of Kalypso's corporate form and forcing RIF Line to arbitrate with Integr8.

### 3. RIF Line Utilized Kalypso To Commit Fraud Upon Integr8

As noted above, piercing the corporate veil is warranted "where . . . a corporation uses its alter ego to perpetrate a fraud." *Status Int'l S.A.*, 994 F. Supp. at 186. Here, Mr. Scagliarini, acting on RIF Line's behalf offered for RIF Line to act as joint and several guarantor of Kalypso's payment obligations. *See* McGregor Decl. ¶ 5, Ex. B.

As also noted above, all bunker confirmations sent by Integr8 were addressed to ""Kalypso Compagnia di Navigazione SpA and/or RIF Line International SpA" as buyers. This designation began as early as October 2022, eight months before the earliest bunker confirmation at issue here. *See* McGregor Decl. ¶ 10.

By the actions of Mr. Scagliarini and Mr. Isola – both of whom acted for *both* RIF Line and Kalypso, they committed a fraud on Integr8 by representing that RIF Line would remain a

"joint and several guarantor" of Kalypso's payment obligations. Relying on these representations, Integr8 sold bunkers to Kalypso and/or RIF Line – and invoiced them both accordingly. Neither Kalypso nor RIF Line ever once objected to their both being named as buyer of the fuel supplied by Integr8.

RIF Line's belated objection to Integr8's demand for arbitration based on the disingenuous contention that only Kalypso, and not RIF Line, was a party to the Integr8 bunker confirmations constitutes a fraud.

## C.    RIF Line has Failed to Carry its Burden in Seeking Injunction Relief

Based on the foregoing facts, RIF Line cannot establish a likelihood of success, or even sufficiently serious questions going to the merits, on its duplicitous argument that it was not a party to the Integr8 bunker confirmations. It is indisputable that RIF Line received the confirmations and Integr8's invoices – which also identified RIF Line as a buyer – and it *never* objected to either document until *after* Integr8 demanded arbitration many months after the transactions.

The equities also do not tip in RIF Line's favor. RIF Line was a long standing customer of Integr8 before RIF Line created Kalypso to handle its ocean shipping business. McGregor Decl. ¶¶ 6-7. RIF Line is the corporate parent of Kalypso, and represented itself as either the corporate parent, owner or a "sister" company of Kalypso. *See* McGregor Decl. ¶ 5, Exs. B, D, E, J, K, L, N. RIF Line also represented to Integr8 that it would guarantee payment of Kalypso's outstanding debts owed to Integr8. *See* McGregor Decl. ¶ 5, Ex. B. And, RIF Line provided Integr8 with financials for both itself and Kalypso, and represented that it would provide Integr8 a "patronage" guarantee for Kalypso in respect of bunkers supplied by Integr8, and that it would remain jointly and severally responsible with Kalypso for debts owed to Integr8. *Id.* Aside from the fact that RIF Line never objected to or contested that it was a party to each and every bunker supply contract

in relation to which Integr8 has demanded arbitration, RIF Line's active participation in the contractual dealings with Integr8 in respect of such contracts heavily tips the equities in Integr8's favor.

Additionally, in its motion papers, including the Declaration of Francesco Isola, RIF Line has misrepresented the following facts:

- "To my understanding RIF Lines has nothing to do directly with this dispute." Isola Decl. ¶ 3. This contention is belied by Mr. McGregor's testimony. *See* McGregor Decl. ¶¶ 5 (Exs. B, C, D, E, F, M), 6, 7, 8, 11, 13, 14, 15, 16, 17, 18 and 19.

- RIF Line and Kalypso "used the same outside consultant, Mr. Luca Scagliarini, to arrange fuel for the ships for both entities." *Id.* ¶ 5. On the contrary, Mr. Scagliarini was in fact "fleet manager" for both RIF Line and Kalypso. *See* McGregor Decl. ¶ 5, Exs. G and H.

- "no one from RIF International was aware that Integr8 had included them as purchasers in the bunker confirmations . . . ." *Id.* ¶ 10. Mr. Isola and RIF Line's fleet manager, Mr. Scagliarini, were both provided copies of the bunker confirmations and invoices. *See* McGregor Decl. ¶¶ 5 (Exs. A, B, C, D), 10, 12, 14, 15, 16, 17 and 18.

- "Mr. Azzena and Mr. McGregor asked whether RIF International would agree to guarantee the payment of these invoices. As CEO of RIF International, I refused." *Id.* ¶ 11. Mr. Isola said he did not see any reason why RIF Line would not do so. *See* McGregor Decl. ¶ 17.

- "RIF International did not authorize anyone to include them as purchasers of the bunkers which are the subjects of Integr8's arbitration demands." *Id.* ¶ 12. This is incorrect as Mr. Scagliarini was "fleet manager" for both Kalypso and RIF Line. *See*

McGregor Decl. ¶¶ 5 (Exs. A, B, G and H). Additionally, Mr. Scagliarini instructed all bunker sellers to provide an updated statement of account for all bunker sellers who "have fixed deals with us (Rif & KCN)" and to provide all future invoices to various RIF Line emails. *See* McGregor Decl. at ¶¶ 5 (Ex. M), 11.

Lastly, RIF Line's argument that it will suffer irreparable harm if it is forced to arbitrate and defend claims when there is no legal obligation to do so is simply the mirror image of the irreparable harm that Integr8 will suffer if RIF Line is permitted to shirk its agreement to arbitrate under a contract to which it is a party. While RIF Line asserts that it was "coerced into arbitrating with Integr8 when Integr8 unilaterally included RIF Line in the Bunker Confirmation Notes and Invoices for these stems . . . ,"[7] the actual fact is that RIF Line knew full well that it was a party to the Integr8 bunker supply contracts and invoices together with its subsidiary, Kalypso, and never once objected until Integr8 demanded arbitration. Thus, under UCC 2-201(2), discussed *supra* at Point II, contracts were formed between Integr8, as seller, and Kalypso and/or RIF Line, as buyer. *See Den Norske Veritas Oljeselskap A.S. v. Hydrocarbon Processing, supra*, 992 F.Supp. 913 (S.D. Tex. 1998).

## **CONCLUSION**

For the foregoing reasons, it is respectfully requested the RIF Line's motion for a temporary and permanent injunction enjoining the Arbitration proceeding be denied because it is obligated to arbitrate with Integr8. RIF Line was a buyer under each of the bunker confirmations at issue, and it failed to timely object to being named a party in these and numerous other Integr8 bunker confirmations and invoices. Alternatively, if RIF Line is found to not be a party to the bunker confirmations, it is nevertheless bound to arbitrate because Kalypso was acting on behalf of its

---

[7] RIF Line Memo of Law at 5 (ECF No. 4).

disclosed principal, RIF Line. In the further alternative, RIF Line is obligated to arbitrate with Integr8 because RIF Line dominated Kalypso in such a manner as to warrant piercing the corporate veil, and/or RIF Line utilized Kalypso to perpetrate a fraud upon Integr8. Accordingly, the motion by way of Order to Show Cause should be denied in its entirety.

Dated: May 27, 2024
New York, NY

Respectfully submitted,

The Respondent,
INTEGR8 FUELS Pte Ltd.

By: _/s/ Patrick F. Lennon_
Patrick F. Lennon
Kevin J. Lennon
LENNON, MURPHY & PHILLIPS, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to all known counsel of record, in accordance with the Federal Rules of Civil Procedure, via ECF on this 27 day of May 2024.

/s/ *Patrick F. Lennon*
Patrick F. Lennon