The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – Phone
(212) 490-6070 - Fax



1599 Post Road East
Westport, CT 06880
(203) 256-8600 – Phone
(203) 255-5700 - Phone
(203) 256-8615 – Fax
(203) 255-5702 - Fax

July 24, 2024

**VIA ECF**
Hon. Margaret M. Garnett
United States District Judge
Thurgood Marshall United States Courthouse
Courtroom 906
40 Foley Square
New York, NY 10008

    **RE:**    **RIF Line International SpA v. Integr8 Fuels Pte Ltd; Case No.: 24-cv-03248(MMG)**
              LMP Ref. 6293

Dear Judge Garnett:

      We represent the respondent, Integr8 Fuels Pte Ltd ("Integr8") in the above-referenced action. We write to respond to Petitioner, RIF Line International SPA's ("RIF Line") supplemental letter brief dated July 17, 2024.

      As a threshold matter, there is nothing in the record to support RIF Lines' retelling of how it and Kalypso went about deciding who they would purchase bunkers from. That said, even assuming RIF Line's account is correct, it proves that Mr. Scagliarini's emails to the market were not offers in and of themselves, but were solicitations for offers, such that the operative offer that subsequently formed the oral contract would have been negotiated by telephone or WhatsApp with Integr8, and subsequently reduced to writing. RIF Line's retelling serves to prove that Intergr8, on the one hand, and RIF Line and Kalypso on the other, came to an oral agreement that was subsequently reduced to writing in the Integr8 bunker confirmations. Such an oral agreement that is reduced to writing is precisely the purview of UCC § 2-201, and as such, RIF Line, because of its failure to timely object, is bound as a party by the terms of the bunker confirmations.

      Furthermore, the record is clear that Mr. Scagliarini's emails to the market were not offers to which Kalypso could be bound, but were – in fact – merely requests for proposals. *See* Scagliarini Decl. at ¶¶ 6 and 7 [ECF No. 20]. According to RIF Line the key terms subject to negotiation were price and payment terms. *See* RIF Line's July 17, 2024 letter at p.1, ¶ 2; *see also* Scagliarini Supp. Decl. at ¶ 3 [ECF No. 27]; Azzena Decl. at ¶ 12, 13, and 14 [ECF No. 22-1]. Mr. Scagliarini puts it perfectly when he says "the important details of the negotiations were the price for the bunkers, the quantity and the specifications." Scagliarini Decl. at ¶ 3[ECF No. 20]. As will be explained below, under the UCC parties can form a contract where price is left open, that is not the case here because Mr. Scagliarini's emails demonstrate that price was the crucial term, such that no agreement could be reached in its absence. *See* Azzena Decl. at ¶ 14 [ECF No. 22-1].

RIF Line asserts that Mr. Scagliarini was unaware that RIF Line was a party to each and every bunker confirmation. Yet, Mr. Scagliarini in his initial declaration testified that "I generally review order confirmations to ensure" that the quantity, specifications, dates of supply, and the specific customer is correct. *See* Scagliarini Decl. at ¶ 9 [ECF No. 20]. Each bunker confirmation is not a lengthy or complex document. The bunker confirmations are two-page documents where the buyers are identified in the top half of the page, just above the agreed price and quantity terms. Particularly in light of the undisputed fact that each bunker confirmation and each invoice was sent by Integr8 to one or more RIF Line email addresses, it is incredible that neither Mr. Scagliarini nor anyone else at RIF Line read the buyer line in any of the ten prior bunker confirmations (or the 10 prior invoices and explicit communications from Integr8 regarding the outstanding balances due from RIF Line and Kalypso). In any event, such an oversight is not only of RIF Line's own making, but it is irrelevant.

### I.     Mr. Scagliarini's Emails Were Solicitations For Offers, Not Offers Themselves

At argument, RIF Line's counsel was correct that under UCC § 2-305 a contract can be formed where the price term is left open. UCC § 2-305 in not applicable here because, as Mr. Scagliarini so aptly stated "please propose your best and competitive fuel price." There is simply no basis to contest that Mr. Scagliarini's initial emails to the market were requests for proposals, and not offers in and of themselves. In fact, Mr. Scagliarini himself describes these emails as requests for proposals. *See* Scagliarini Decl. at ¶¶ 3, 6, and 7. By this admission, Mr. Scagliarini's emails were not offers to be accepted by the various bunker suppliers, but were invitations for the various bunker suppliers to make offers as to price and payment terms for the specific ships within RIF Line's specified quality and delivery windows.

If Mr. Scagliarini's emails to the market were offers, then each and every one of the bunker suppliers on his email could have accepted and supplied bunkers at a price fixed by the seller in good-faith. *See* UCC § 2-305(2). Mr. Scagliarini's emails are best viewed under UCC § 2-305(4) which provides "[w]here, however, the parties intend not to be bound unless the price be fixed or agreed, and it is not fixed or agreed there is no contract." Mr. Scagliarini's requests for proposals cannot properly be viewed as offers, as a plain reading of his emails demonstrate that he was seeking offers from several bunker suppliers at once, one of whom was Integr8.

As noted above, one of the terms left open for negotiation was the "payment term", i.e., how much credit the bunker supplier would provide before payment came due. It flows logically that a bunker supplier, such as Integr8, would agree to better payment terms where RIF Line is listed as a buyer alongside Kalypso, rather than newly formed Kalypso on its own.

Moreover, Mr. Scagliarini's requests for proposals are analogous to an auction under UCC § 2-328. Pursuant to UCC § 2-328, the item placed for sale is not an offer, but a solicitation for offers. In an auction, the bids on the item are the offers that are accepted when the auctioneer so announces. Here, Mr. Scagliarini's emails are solicitations for the supply of certain vessels with bunkers, and the bids are the price and payment terms that the bunker suppliers offer.[1] As Integr8

---

[1] For example, on August 25, 2023 Mr. Scagliarini's email to the market for the bunker supply of the ZHONG GU YING KOU where he stated "…best prices win." [ECF 5-2 at P. 11].

2

has argued in its opposition papers, the contract was formed during the communications between Mr. Azzena and Mr. Scagliarini that Integr8 later reduced to writing in the bunker confirmation.

Mr. Scagliarini's solicitation emails demonstrate that his objective intent was for each supplier to confirm if they were able to supply bunkers at all, and if so, at what price. From there Mr. Scagliarini would then attempt to negotiate prices with each bunker supplier. Such further negotiation as to price rendered Mr. Scagliarini's email moot in respect of terms of the subsequently formed contract. As explained above, it was Integr8 who made the operative offer that was then accepted by Mr. Scagliarini, on behalf of RIF Line and Kalypso.[2]

## II.      UCC § 2-201, Not UCC § 2-207, Governs

"Under New York law, section 2-207 of the UCC governs the formation of contracts when the terms of the parties' writings are not identical." *Stemcor USA, Inc. v. Trident Steel Corp.*, 471 F. Supp. 2d 362, 366 (S.D.N.Y. 2006). Here, there are only two writings – Mr. Scagliarini's request for price offerings by at least thirteen different bunker suppliers and Integr8's bunker confirmations. As explained above, Mr. Scagliarini's initial emails, that he describes as requests for proposals, were not offers but requests for proposals. *See* Scagliarini Decl. at ¶¶ 3, 6, and 7. Accordingly, each of the contracts was formed when Mr. Scagliarini and Mr. Azzena agreed over the telephone to price and payment terms. An agreement that Integr8 confirmed in writing to RIF Line and Kalypso  This is not a scenario where RIF Line and Kalypso issued a purchase order followed by Integr8 issuing a confirmation with different, additional or conflicting terms.  Rather, it involves the parties orally (or via WhatsApp messages) agreeing to material terms, followed by a written confirmation of the contract – falling precisely within the purview of UCC § 2-201.

The facts as they exist here are unlike the traditional battle of the forms where:

> two merchants exchanged two sets of forms that contained additional or different terms, ignored them, and fully or substantially performed their agreement. A dispute then breaks out, and the parties, or more likely their lawyers haul out their forms and read them - perhaps for the first time - and they will find that their forms diverge.

*In re CHATEAUGAY Corp.*, 162 B.R. 949, 954 (Bankr. S.D.N.Y. 1994). Here, Mr. Scagliarini solicited the market. Integr8 made an offer to which Mr. Scagliarini orally agreed. Integr8 subsequently reduced the oral agreement to a written confirmation that served to form the contract. Neither RIF Line nor Kalypso objected to the confirmation or sent back a confirmatory writing containing different terms.  In fact, RIF Line did not object until months later when Integr8 demanded arbitration. An oral contract that is later reduced to writing is exactly the scenario that UCC § 2-201(2) addresses. Thus, the Court should apply UCC § 2-201(1) to find that RIF Line's failure to timely object to its designation as a buyer binds its to the terms contained in the bunker confirmations.

---

[2] RIF Line attempts to argue that Mr. Scagliarini lacked the authority to bind RIF Line to Kalypso's bunker supply contracts. This argument overlooks the fact that RIF Line and Kalypso both held Mr. Scagliarini out as a fleet manager, who was cloaked with the apparent authority to bind each of them to bunker supply contracts, and at one point in the parties dealings wrote, speaking for both entities, that RIF Line would guarantee Kalypso's bunker debts.

### III. If UCC § 2-207 Applies, RIF Line's Inclusion Was Not a Material Alteration

Assuming *arguendo* UCC § 2-207 applies, the inclusion of RIF Line was not a material alteration. "A material alteration is one that would 'result in surprise or hardship if incorporated without express awareness by the other party.'" *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226 (2d Cir. 2000). "[T]he burden of proof as to whether an additional term materially alters the contract rests on the 'party that opposes inclusion.'" *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12-CV-5262 (JPO), 2014 U.S. Dist. LEXIS 132108, at *11 (S.D.N.Y. Sep. 18, 2014) (quoting *Bayway Refining*, 215 F.3d at 223)). In its July 17, 2024 letter RIF Line attempts to argue that it was "surprised" by its inclusion as a buyer. Notably, RIF Line failed to argue that its inclusion as an additional buyer posed a hardship. Given the course of dealing between RIF Line and Kalypso, as well as the placement of the buyer designation in the bunker confirmation, the argument that RIF Line was surprised must fail.

When analyzing whether an additional term constitutes a surprise under the UCC, courts must look to "what did the assenting party know and what should it have known." *In re CHATEAUGAY Corp.*, 162 B.R. at 957. "Factors bearing on this issue include the parties' prior course of dealing and the number of written confirmations that they exchanged, industry custom and the conspicuousness of the term." *Id.*

Here, it is undisputed that there are ten prior written confirmations and ten corresponding invoices going back nearly a year where RIF Line was identified as a buyer alongside Kalypso. *See*, McGregor Decl. at Ex. A, P. 5, 9, 14, 19-20, 24-25, 32-33, 37,41-42, 47, 50-51. 55, 58-59, 62-63, 66, 71-72, 81-82, 85-87, 90, and 93-94. Mr. Scagliarini had an affirmative duty to review the entire bunker confirmations, whether he did or not is irrelevant because he should have noticed that RIF Line was identified as a buyer. Finally, RIF Line's inclusion as a co-buyer was not hidden away, it was near the top front of each bunker confirmation and every invoice. It is preposterous that Mr. Scagliarini, Mr. Isola, or anyone at RIF Line would be surprised by the inclusion of a term found within the top third of the front page of a two page document. Below is an example of a bunker confirmation and the corresponding invoice for the bunker supply to the ZHONG GU PENG LAI at Hambantota.



We hereby confirm the following order:

| | |
|---|---|
| Order No: | 119338 |
| Vessel: | ZHONG GU PENG LAI (IMO: 9809203) |
| Port: | Hambantota |
| Date Range: | 18 Sep 2023   to   21 Sep 2023 |
| Buyer: | Kalypso Compagnia di Navigazione SpA and/or RIF International SpA AND JOINTLY AND SEVERALLY OWNERS/MANAGING OWNERS/OPERATORS/MANAGERS/DISPONENT OWNERS/CHARTERERS. MERE RECEIPT OF THIS CONFIRMATION SIGNIFIES ACCEPTANCE OF RESPONSIBILITY FOR PAYMENT OF OUR BUNKER INVOICE BY EACH AND ALL OF THEM. |



**Kalypso Compagnia di Navigazione SpA and/or RIF International SpA**

**Piazza della Vittoria 12/21 - 16121 Genova, Italy**

| | |
|---|---|
| Invoice Date | : 27 Sep 2023 |
| Invoice No | : IFPL19473 |
| Due Date | : 18 Nov 2023 |
| Supply Date | : 20 Sep 2023 |
| Payment Term | : 60 |

Put simply, RIF Line knew, should have known and was on constructive notice[3] that it was named as a co-buyer in each and every bunker confirmation, and there is no plausible way that it could be surprised by its inclusion as a buyer when there was a lengthy course of dealing between the Parties that resulted in more than twenty prior writings confirmation (ten bunker confirmations, ten corresponding invoices and various collection emails from Integr8 to both RIF Lines and Kalypso – see McGregor Decl. Exs. A, C, D, O, Q and R [ECF No. 17]) and the additional term was prominently displayed in the top half of each document. Again, Mr. Scagliarini also testified that he would review the buyer section. *See* Scagliarini Decl. at ¶ 9 [ECF No. 20]. Accordingly, RIF Line could not have been surprised that it was included as a buyer and this Court should find that RIF Line was a proper party to each of the bunker confirmations at issue here.[4]

**Conclusion**

For all of the foregoing reasons, and for those reasons more fully explained in Integr8's opposition papers, this Court should deny RIF Line's petition because RIF Line was a party to each of the bunker supply contracts. Integr8 respectfully submits that Mr. Scagliarini's "requests for proposals" were just that, i.e., requests for offers, and not offers in and of themselves. Accordingly, UCC § 2-201 applies because the operative offer and acceptance occurred orally, as such Integr8's written confirmations formed the contracts to which RIF Line failed to object to and it is therefore bound to the contracts and to arbitrate disputes with Integr8.

We thank the Court for its time and consideration.

Very truly yours,

Patrick F. Lennon
Elliott T. Williams

---

[3] As mentioned above, each bunker confirmation and each invoice was sent by Integr8 to one or more RIF Line email addresses.

[4] RIF Line attempts to argue that UCC 2-201 does not apply because performance occurred within ten days of the formation of the contract. This argument must fail. With the exceptions of the August 28, 2023 bunker confirmation for the ZHONG GU YING KOU, each bunker confirmation was issued the same day as Mr. Scagliarini's requests for proposals with performance occurring during the delivery window required by RIF Line.